BROWN WHITE & OSBORN LLP
CALEB E. MASON (Bar No. 246653)
SCOTT L. MENGER (Bar No. 305877)
333 South Hope Street, 40th Floor
Los Angeles, California 90071-1406
Telephone:  213. 613.0500
Facsimile:  213.613.0550
cmason@brownwhitelaw.com
smenger@brownwhitelaw.com

Attorneys for Plaintiff
CRYSTAL HOLMES

## UNITED STATES DISTRICT COURT

## CENTRAL  DISTRICT OF CALIFORNIA

| | |
|---|---|
| CRYSTAL HOLMES,<br><br>             Plaintiff,<br><br>v.<br><br>ROSALINA HARRIS, in her individual and official capacity; DEAN HARRIS, an individual; ARLANI HARRIS, an individual; and DOES 1-10, inclusive,<br><br>             Defendants. | Case No. 18-cv-3739<br><br>**COMPLAINT FOR:**<br><br>**1.   MALICIOUS PROSECUTION;**<br><br>**2.   DEPRIVATION OF CIVIL RIGHTS IN VIOLATION OF 42 U.S.C. § 1983; AND**<br><br>**3.   DEPRIVATION OF CIVIL RIGHTS IN VIOLATION OF 42 U.S.C. § 1983**<br><br>**<u>DEMAND FOR JURY TRIAL</u>** |

Plaintiff Crystal Holmes ("Ms. Holmes") alleges as follows:

## I.

## <u>INTRODUCTION</u>

1.     On February 25, 2017, Detective Rosalina Harris of the Los Angeles County Sheriff's Department ("Detective Harris") used her official position to maliciously procure the wrongful arrest of her next-door neighbor, Ms. Holmes, in conspiracy with Detective Harris' husband Dean Harris ("Mr. Harris") and her adult daughter Arlani Harris (collectively with Detective Harris and Mr. Harris, "Defendants" or "the Harrises").  Defendants falsely and maliciously accused Ms.

BROWN WHITE & OSBORN
ATTORNEYS

Holmes of attempting to hit Arlani Harris with her car, and used Detective Harris'
influence with the LASD to have Ms. Holmes arrested.

2.      Defendants fabricated their story in order to retaliate against Ms. Holmes
as a part of a long-running dispute between Ms. Holmes and the Harrises, that
originated with the Harrises parking their cars in Ms. Holmes' driveway without her
permission.  The Harrises repeatedly harassed Ms. Holmes when she complained
about their behavior, and in the Fall of 2016, Ms. Holmes went to court to seek a
restraining order against Mr. Harris to protect herself from his ongoing harassment.
The Harrises thereupon conspired to retaliate against Ms. Holmes.  Detective Harris
maliciously used her position, authority, and influence with her LASD colleagues to
procure Ms. Holmes' wrongful arrest in violation of Ms. Holmes' Fourth Amendment
rights.

3.      Defendants' actions were unconscionable: they falsely accused Ms.
Holmes of attempting to hit their adult daughter with her car, in order to retaliate
against her for seeking a restraining order against Mr. Harris.  Worse, they did so
using Detective Harris' authority, position and influence as a police officer to
perpetrate the scheme.  And they might have gotten away with it, but for Ms. Holmes'
video cameras, which captured the entire incident and exposed the Harrises' actions.

4.      When the District Attorney's office saw the video, it declined to
prosecute Ms. Holmes.  And when a Los Angeles County Superior Court judge saw
the video, on August 11, 2017, he granted Ms. Holmes' motion for a judgment of
factual innocence under Penal Code section 851.8.  Ms. Holmes now asks this Court
to hold Defendants accountable for their malicious prosecution and violation of her
constitutional rights.

## II.

## JURISDICTION AND VENUE

5.      This Court has subject-matter jurisdiction over this action because the
case arises under the Fourth and Fourteenth Amendments to the United States

Constitution, and under Title 42, section 1983 of the Unites States Code.

6.    Venue is proper in this Court because Ms. Holmes and Defendants reside in this District, and because all or a substantial part of the events or omissions giving rise to the claims for relief occurred in this District.

### III.

### THE PARTIES

7.    Ms. Holmes is, and at all times mentioned was, an individual residing in the state of California.

8.    Defendant Detective Harris, a resident of the state of California, is an individual employed by the Los Angeles Sheriff's Department ("LASD") as a Deputy Sheriff and Detective.  Detective Harris is sued in both her individual and official capacities.

9.    Defendant Mr. Harris is, and at all times mentioned was, an individual residing in the state of California.

10.    Defendant Arlani Harris is, and at all times mentioned was, an individual residing in the state of California.

11.    Ms. Holmes is ignorant of the true names and capacities of defendants sued herein as Does 1 through 10, inclusive, and therefore sue said defendants by fictitious names.  Ms. Holmes will amend this complaint to allege their true names and capacities when they are ascertained.

12.    Plaintiff is informed and believes and therefore alleges that each of the fictitiously named defendants was responsible in some manner for the occurrences herein alleged, and that Plaintiffs' injuries as herein alleged were proximately caused by said defendants.

13.    Plaintiff is informed and believes and therefore alleges that Defendants were the agents of their co-defendants and in doing the acts herein alleged were acting within the scope of such agency and with the permission of their co-defendants.

## IV.
## **EXHAUSTION OF ADMINISTRATIVE REMEDIES**

14.     On or about February 7, 2018, Ms. Holmes filed with the Board of Supervisors of the County of Los Angeles a Claim for Damages to Person or Property for the harm she incurred as a result of Defendants' conduct.

15.     On or about February 9, 2018, the County of Los Angeles denied her claim.  Because Ms. Holmes filed her administrative claim within six months of the Superior Court's judgment of factual innocence under Penal Code section 851.8, which was issued on August 11, 2017, she has exhausted her administrative remedies.

## V.
## **FACTUAL ALLEGATIONS**

16.     Ms. Holmes is a homeowner in Altadena, California.  Ms. Holmes has owned and lived in her home since 1998.  Ms. Holmes is a corporate consultant who frequently travels for work around the country.  Her clients regularly conduct background checks before hiring outside consultants, and many will not hire consultants with any criminal record, even arrests.

17.     Defendants are Ms. Holmes' next-door neighbors.  The two properties have adjacent driveways separated by an 18-inch-wide strip of grass.  Shortly after Ms. Holmes moved in, Defendants, who own three vehicles, began using Ms. Holmes' driveway as an access way to their own driveway, so they would not have to move their own cars out of their driveway when coming and going.  They also began parking some of their vehicles in Ms. Holmes' driveway, and inviting their guests to do the same, whenever Ms. Holmes was traveling for work.  When the Harrises had work done on their house, they directed their construction crews to use Ms. Holmes' driveway.  Defendants never asked permission from Ms. Holmes or even notified her that they were using her driveway.  Ms. Holmes repeatedly returned home to find herself unable to park in her own driveway because it was already occupied by Defendants' vehicles and/or their guests' vehicles.  When Ms. Holmes politely asked

Mr. Harris if Defendants would please stop parking vehicles in Ms. Holmes' driveway, Mr. Harris refused, saying: "If your car is not in your driveway, we are going to use it, and there is nothing you can do about it."  Ms. Holmes was finally forced to install a fence between the driveways.

18.    The dispute escalated over the years.  Mr. Harris increasingly made rude and threatening statements to Ms. Holmes, to the point where she became afraid of Mr. Harris.  Mr. Harris and Detective Harris then began to engage in physical acts of harassment and intimidation, captured on video by Ms. Holmes' home surveillance system.  This behavior included, *inter alia*:

a.    Parking Defendants' vehicles directly in front of and behind Ms. Holmes' vehicle, when it was parked on the street, so that Ms. Holmes could not move it;

b.    Deliberately ramming his truck into Ms. Holmes' parked vehicle, causing damage;

c.    Deliberately using a leaf blower and hose to blow and spray trash and debris, including dog urine and feces from the Harrises' dogs, onto Ms. Holmes' yard and driveway; and

d.    Cutting a gate on Ms. Holmes' property that was attached to the fencepost between the properties.

e.    Putting a shovel through the fence to tear down parts of a tarp Ms. Holmes had installed.

f.    Intentionally running over and destroying a survey post Ms. Holmes had installed to mark the property line.

19.    The Harrises' behavior is illustrated in the following images.  The following photo shows Detective Harris on November 19, 2017.  Detective Harris's dog defecated on the Harrises' driveway near the chain-link fence between the properties.  Detective Harris came outside, turned on her hose, and sprayed the feces onto Ms. Holmes' driveway, making a stinking and unsanitary puddle on Ms. Holmes'

driveway:



20.     Detective Harris's conduct was despicable, created a health hazard, and violated Los Angeles County Municipal Code Title 10, section 40.066 (providing that "[a] person who owns or has custody of a dog (except a visually-impaired person with a guide dog) is required to remove the dog's feces immediately from public property or private property not owned or possessed by the owner or custodian of the dog. The dog's feces must be disposed of in a sanitary manner.  A violation of this section is an infraction punishable by a fine of up to $100.").  Detective Harris owes Ms. Holmes and the people of Los Angeles County an explanation for why she feels entitled to

treat her neighbor this way.

21.    Mr. Harris also regularly disposed of the Harrises' litter by blowing it onto Ms. Holmes' driveway.  The following image shows Mr. Harris, on January 4, 2015, using a gasoline-powered leaf blower, to blow litter and debris from the Harrises' driveway onto Ms. Holmes' driveway:



22.    Ms. Holmes reported incidents to the police on several occasions, but received no relief.  For example, in 2009, Ms. Holmes made a complaint to the Sheriff's Department because Detective Harris was parking her official County vehicle in Ms. Holmes' driveway.  Ms. Holmes went to the Altadena Sheriff's Station and filed a complaint about Detective Harris.  Ms. Holmes spoke to a sergeant, who told her that without evidence, it would be Detective Harris' words against hers, and the Department would believe Detective Harris.  Detective Harris and Defendants continued to use Ms. Holmes' driveway for their own personal benefit.

23.    In 2013, Ms. Holmes wrote a letter to Detective Harris' commanding officers to inform them of Detective Harris' continuing conduct, because her prior

complaint had had no effect.  Detective Harris' lieutenant assured Ms. Holmes that Detective Harris would stop parking her vehicle in Ms. Holmes' driveway.  But Defendants continued to use Ms. Holmes' driveway for their own purposes.

24.   Defendants continued to harass Ms. Holmes in various ways.  For example, on or about April 13, 2015, Ms. Holmes parked on the street outside of her home.  Mr. Harris took two of his vehicles and parked them on either side of Ms. Holmes' vehicle, right up to the fenders.  Mr. Harris' vehicles were so close to Ms. Holmes' that she could not move her vehicle.  The following photo shows Mr. Harris immediately after he finished the job. Mr. Harris is crossing the street after parking his two vehicles directly in front of and behind Ms. Holmes' vehicle (in red):



25.   On or about September 12, 2016, Detective Harris explicitly used her law enforcement position to intimidate Ms. Holmes.  Detective Harris wanted Ms. Holmes to take down a tarp that Ms. Holmes had attached on her side of the fence between the properties.  The tarp was not visible from Defendants' property.  Rather than speak with Ms. Holmes herself, Detective Harris requested fellow deputy sheriffs to appear––on-duty, in uniform, and armed—at Ms. Holmes' door, to demand that Ms. Holmes take down the tarp.  Two armed, uniformed deputy sheriffs came to Ms. Holmes' door and informed Ms. Holmes that "Rosalina wants the tarp off the fence."  Ms. Holmes was frightened and intimidated.  Later that same day, Detective Harris requested the deputy sheriffs to come back to Ms. Holmes' house a second time.  One of the same deputy sheriffs did so, and reiterated Detective Harris' request.  He then demanded Ms. Holmes remove her gate attached to the fencepost because, they said, Defendants

were planning on tearing the fence down.

26.     On or about September 30, 2016, while Ms. Holmes' vehicle was parked on the street, Mr. Harris backed his truck with significant force into the front of Ms. Holmes' car, causing damage.  This event was also caught on video by Ms. Holmes' home surveillance cameras.  Ms. Holmes reported the event to the California Highway Patrol.  The California Highway Patrol confirmed the incident from the videotape and interviewed Mr. Harris.  Mr. Harris stated that it must have been an accident.

27.     Mr. Harris repeatedly told Ms. Holmes that he and Detective Harris would do whatever they wanted, and there was nothing Ms. Homes could do about it.  On multiple occasions, when Ms. Holmes asked Mr. Harris to stop engaging in trespassing and harassing behavior, he responded: "Go ahead, go to the police.  They're not going to do anything to us."

28.     In desperation, on or about October 24, 2016, Ms. Holmes filed a petition in Los Angeles County Superior Court seeking a protective order enjoining Mr. Harris from harassing and threatening her.  The court granted a TRO and held an evidentiary hearing on the request for a permanent injunction.  The hearing took place over multiple dates between November 2016 and January 2017.  As part of the hearing, Mr. Harris presented a declaration from a purported "psychologist" named Argiro Julie Kiotas.  Ms. Kiotas—who is not a licensed psychologist—stated under oath that she is a "psychologist of 26 years," and proceeded to offer a purportedly psychological evaluation of Ms. Holmes—whom she has never met or spoken to.  Ms. Kiotas stated that in her "professional opinion," Ms. Holmes had a "serious personality disorder," and was "harass[ing]" the Harris family and "causing turmoil."  On January 30, 2017, in reliance in part on Ms. Kiotas' declaration, the court denied Ms. Holmes' request for a permanent injunction.

29.     Ms. Kiotas is not a licensed psychologist.  Nor has she ever met or spoken with Ms. Holmes.  Ms. Kiotas' actions in representing herself to the Court as a "psychologist," and proffering a purported "professional opinion" about Ms. Holmes

1  was a flagrant violation of California Business & Professions Code §§ 2900 et seq.,

2  and Ms. Holmes has filed a complaint with the California Board of Psychology

3  regarding Ms. Kiotas' unauthorized practice of psychology.

4       30.    On February 25, 2017, in retaliation for Ms. Holmes' seeking the

5  restraining order against Mr. Harris, Defendants conspired to, and did, falsely accuse

6  Ms. Holmes of attempting to hit Arlani Harris with her car, and conspired to, and did,

7  use Detective Harris' official status and authority to maliciously procure Ms. Holmes'

8  arrest.

9       31.    Defendants falsely accused Ms. Holmes of attempting to hit Arlani Harris

10  with her vehicle, and conspired to procure her wrongful arrest and to maliciously

11  prosecute her for assault with a deadly weapon.  Ms. Holmes' home surveillance

12  system captured the events on video.  That video, which is safely in the possession of

13  the LASD Inspector General, shows the Harrises deliberately inventing a false

14  accusation, and then leveraging Detective Harris's official status and position with the

15  LASD to procure Ms. Holmes' wrongful arrest.

16       32.    On February 25, 2017, at approximately 12:00 p.m., Mr. Harris and

17  Arlani Harris drove onto the block on which the Harrises and Ms. Holmes live, in Mr.

18  Harris' pickup truck.  Mr. Harris and Arlani Harris later stated to the police that they

19  had seen Ms. Holmes' car approaching a short distance away as they approached the

20  house.  Mr. Harris drove a significant distance past Defendants' property, then

21  reversed and parking on the opposite side of the street from the house.  Shortly

22  thereafter, Ms. Holmes drove her SUV past her house, to make a U-turn down the

23  block.  As was her habit when approaching her home from this direction (that is, when

24  her driving lane was on the far side of the street from the house), Ms. Holmes always

25  made a U-turn farther down the block, drove back to her house on her side of the

26  street, and then backed her vehicle into her driveway.  Defendants had seen Ms.

27  Holmes perform this maneuver many times.

28       33.    As soon as Ms. Holmes passed the Harris's truck, Mr. Harris and Arlani

Harris exited the pickup truck and looked down the street, watching Ms. Holmes as she made the U-turn. They engaged in brief conversation, and then Mr. Harris crossed the street towards Defendants' property, alone, while Arlani Harris waited outside the pickup truck on the far side of the street. Mr. Harris then stopped on his front lawn and turned back to watch the street. There was no apparent reason for Arlani Harris to wait at the pickup truck while her father crossed the street.

34.     Arlani Harris watched Ms. Holmes' vehicle as it came back towards the property. Arlani Harris then crossed the street, timing her crossing so that Ms. Holmes' vehicle, now pulling up slowly past the properties, passed behind her. Mr. Harris watched Arlani Harris as she crossed the street. Immediately after Ms. Holmes passed Arlani Harris, Arlani Harris visibly laughed.

35.     Mr. Harris and Arlani Harris both knew that Ms. Holmes had not attempted to hit Arlani Harris, and that Arlani Harris had not jumped, dodged, scurried, or in any other way altered her normal gait while crossing the street. Mr. Harris and Arlani Harris knew that Ms. Holmes had not tried to hit Arlani Harris with her car, and that there was no probable cause that Ms. Holmes had committed any crime. Arlani Harris then approached Mr. Harris, and they engaged in conversation leading to more laughter from Arlani Harris. Mr. Harris and Arlani Harris then turned to stare at Ms. Holmes' vehicle.

36.     During these interactions, Mr. Harris and Arlani Harris conspired to falsely accuse Ms. Holmes of attempting to hit Arlani Harris with her car and to use Detective Harris' official status and authority to maliciously procure Ms. Holmes' arrest.

37.     As Ms. Holmes stopped and began to back into her driveway, Mr. Harris took a few steps toward her vehicle, fixedly staring at Ms. Holmes. Ms. Holmes saw Mr. Harris approaching the vehicle, and his behavior, aggressive stance, and fixed stare caused her great fear. Ms. Holmes therefore stopped her vehicle partway down the driveway, because she was afraid to exit her vehicle until Mr. Harris had entered

his home.  But Mr. Harris did not go inside, and instead continued to stare at Ms. Holmes from his front yard and/or front porch.  Ms. Holmes stayed in her vehicle. Mr. Harris made two phone calls while standing and staring at Ms. Holmes.  On information and belief, Mr. Harris called Detective Harris, and they conspired to use Detective Harris's official status and authority to falsely and maliciously procure Ms. Holmes' arrest, by falsely accusing Ms. Holmes of attempting to hit Arlani Harris with her car.

38.    Approximately twenty minutes after Mr. Harris' phone calls, two LASD vehicles appeared.  Mr. Harris waved at the first vehicle, an SUV, as it approached and parked down the block.  The second vehicle, a police cruiser, parked in front of Ms. Holmes' home.  As one deputy, whose name is presently unknown to Ms. Holmes, exited the cruiser, a second deputy, LASD Sergeant Crosswhite, approached Mr. Harris from the first vehicle, greeting him with a familiar handshake and speaking with him in a friendly manner.

39.    The unnamed deputy spoke to Ms. Holmes and informed her that Mr. Harris and Arlani Harris had accused her of trying to run over Arlani Harris as she crossed the street.  Ms. Holmes vehemently denied the accusation.  Meanwhile, Sgt. Crosswhite and a third deputy, Deputy Cano, spoke with Arlani Harris.

40.    Mr. Harris and Arlani Harris each lied to the LASD deputies.  They both falsely stated that Ms. Holmes had attempted to hit Arlani Harris with her car, and that Arlani Harris had to jump, or dodge, or scurry out of the path of Ms. Holmes' car. They knew that those statements were false, and they made them in bad faith, in the attempt to procure Ms. Holmes' arrest, in order to retaliate against her.

41.    After speaking with Mr. Harris and Arlani Harris, and with Ms. Holmes, the LASD deputies convened.  Sgt. Crosswhite then walked over to Mr. Harris. During their conversation, Mr. Harris became quite animated, appearing to argue with or berate Sgt. Crosswhite, and making forceful hand gestures and body movements. On information and belief, and based on the video evidence, Mr. Harris demanded that

the LASD deputies arrest Ms. Holmes.

42.     Several LASD deputies stopped to speak with Mr. Harris and Arlani Harris over the next ten minutes.  During these conversations, each LASD deputy was conciliatory toward Mr. Harris and Arlani Harris.  Mr. Harris, on the other hand, was even more animated, continuing to make forceful hand gestures.  On information and belief, Mr. Harris and Arlani Harris demanded, to each LASD deputy on the scene, that they arrest Ms. Holmes.  On information and belief, Mr. Harris and Arlani Harris used their relationship with Detective Harris to influence the LASD deputies and persuade them to arrest Ms. Holmes.

43.     At approximately 12:35 p.m., Detective Harris arrived at the house, wearing plain clothes. Detective Harris knew some or all of the other deputies at the scene, and engaged in immediate conversation with each of them in turn.  Detective Harris spoke briefly with Deputy Cano, and then walked over and spoke with Mr. Harris and Arlani Harris in front of the Harris house.

44.     On information and belief, Mr. Harris and Arlani Harris discussed with Detective Harris their conspiracy to use Detective Harris's official status and authority to falsely and maliciously procure Ms. Holmes' arrest.  Detective Harris, along with Mr. Harris and Arlani Harris, knew that Ms. Holmes had not tried to hit Arlani Harris with her car, and that there was no probable cause that Ms. Holmes had committed any crime.  Mr. Harris and Arlani Harris told Detective Harris that they had not been successful in persuading the LASD deputies to arrest Ms. Holmes, and that Detective Harris needed to use her official status, authority, and influence to persuade them to do so. Detective Harris agreed and intended to, and did, thereupon further the conspiracy by using her official status, authority, and influence to persuade her LASD colleagues to arrest Ms. Holmes, knowing full well that there was no probable cause that Ms. Holmes had committed any crime.

45.     Detective Harris then approached Sgt. Crosswhite, with whom she spoke for approximately one minute, and then with the rest of the LASD deputies on the

lawn, also for approximately one minute.  On information and belief, Detective Harris used her status as an LASD detective to attempt, in conspiracy with Mr. Harris and Arlani Harris, to procure the wrongful arrest of Ms. Holmes based on the false and malicious accusations made by Mr. Harris and Arlani Harris.

46.     Deputy Cano then took Ms. Holmes' statement concerning the incident. Ms. Holmes vehemently denied the claim that she had attempted to run Arlani Harris over.

47.     While Deputy Cano took Ms. Holmes' statement, Detective Harris, Mr. Harris, Arlani Harris, and the unnamed deputy engaged in conversation.  Then, Sgt. Crosswhite joined the conversation for several minutes.  Sgt. Crosswhite and Mr. Harris walked out to the street, where they engaged in further conversation.  Sgt. Crosswhite, Mr. Harris, and Detective Harris then held a conversation lasting several minutes.  Mr. Harris walked away, and Sgt. Crosswhite and Detective Harris continued their conversation.

48.     Ms. Holmes decided to get out of her vehicle, and spoke with Sgt. Crosswhite alone for approximately eight minutes.  At the conclusion of their conversation, an additional LASD sergeant, whose name is presently unknown to Ms. Holmes, arrived at the scene.  Detective Harris intercepted this new LASD sergeant when he got out of his vehicle and spoke with him alone for approximately two minutes, before he had spoken to any of the officers on the scene.  On information and belief, Detective Harris used her official LASD status, office, and authority to procure Ms. Holmes' wrongful arrest by requesting that the LASD sergeant order Ms. Holmes' arrest.

49.     Immediately after speaking with Detective Harris, the LASD sergeant spoke with Sgt. Crosswhite and Deputy Cano, then made a call on his radio. Immediately thereafter, Sgt. Crosswhite and Deputy Cano arrested Ms. Holmes on suspicion of attempted assault with a deadly weapon, a violation of California Penal Code section 245(a)(1).

50.     After Ms. Holmes was led away, Mr. Harris and Arlani Harris spoke with Deputy Cano.  Arlani Harris appeared to demonstrate "jumping" out of the way of a car—in direct contradiction to her actual actions as proved by the video recording.  During that conversation, Deputy Cano briefly turned her back on Mr. Harris and Arlani Harris.  Arlani Harris then turned to Mr. Harris, laughed, and danced.

51.     After Ms. Holmes' arrest, the assigned LASD investigator examined the video recording showing the events described above.  The investigator determined that no crime had been committed and recommended that the District Attorney's Office decline to press charges.  The District Attorney's Office agreed with the assessment, and declined to file charges.  The District Attorney's office stated: "[Arlani Harris] claims the suspect tried to hit her.  The video does not support her claim."

52.     Ms. Holmes thereupon retained an attorney to file a motion for a finding of factual innocence pursuant to California Penal Code section 851.8.  On August 11, 2017, Judge Darrell Mavis of the Los Angeles County Superior Court reviewed the video, then granted the motion and issued an order finding Ms. Holmes factually innocent of any crime in connection with the Harrises' accusation.

53.     Defendants continued to use Detective Harris's status, authority, position, and connections with the LASD to harass Ms. Holmes and retaliate against her in their ongoing feud.  On multiple occasions, including December 10, 2017, February 15, 2018, and April 3, 2018, Detective Harris called deputies at the Altadena Sheriff's Station and requested that they come to Ms. Holmes' house—armed, on-duty, in uniform—to direct Ms. Holmes to move various objects, including her ladder and her recycling and trash bins, which were in Ms. Holmes' side yard, because they were "touching" the fence between the houses.

54.     The deputies repeatedly told Ms. Holmes that she must not allow her recycling bins or ladder (in her own yard) to touch the fence between the properties; they appeared at her house, in groups, on multiple occasions.  On each occasion, multiple deputies, in multiple vehicles, would come to Ms. Holmes' house.  While one

deputy spoke to Ms. Holmes, others would peer into her yard, stand nearby in an intimidating manner, hand on gun, or walk around her premises.

55.     They repeatedly interrogated her about why she allowed her recycling bins to "touch" the fence; didn't she know, the deputies asked, that the fence was the Harrises'?  Why was she allowing her bins and ladder to touch it?  The deputies grilled Ms. Holmes as if they were investigating a crime.  Ms. Holmes was frightened and intimidated by these actions.  Detective Harris flaunted her ability to use her official position, status and connections to intimidate her neighbor: the following images show the four armed, uniformed, on-duty LASD deputies whom Detective Harris summoned to come to Ms. Holmes' residence on April 3, 2018, knock on her door, demand to inspect her premises, and interrogate her as to whether her recycling bin, ladder or any other object was touching the fence between the houses:





56.     Then, on or about April 4, 2018, the Harrises repeated their February 25, 2017 performance, and *again* attempted to frame Ms. Holmes for a crime.

57.     In February 2018, Ms. Holmes had installed a short section of fence between the side yards of the two houses. Ms. Holmes' fence fills in a gap between her gate and a vinyl fence that the Harrises had installed along part of the boundary between the houses' side yards.  Ms. Holmes' fence is chain link, and Ms. Holmes affixed a tarp to it on the side of the fence facing her house.  At the point where Ms. Holmes' fence and the Harrises' fence meet, there is an approximately 6-inch gap. Ms. Holmes stretched her tarp across that gap and taped it to the edge of the Harrises' fence.  As described herein, on April 3, 2018, Detective Harris called multiple on-duty LASD deputies to come to Ms. Holmes' house, knock on her door, and demand that Ms. Holmes move a ladder and recycling containers which were in Ms. Holmes' backyard, against the (Harrises') fence.  The deputies told Ms. Holmes that Detective Harris "wants them moved," and interrogated Ms. Holmes about why she had allowed those household items in her backyard to "touch [Detective Harris's] fence."

58.     On the afternoon of April 4, 2018, Rosalina Harris reached through the gap between the fences, and partially pulled down the tarp, and took photographs of Ms. Holmes' yard.   Ms. Holmes came home at approximately 6:40 p.m. and found the tarp pulled down.  She went out to re-attach it, again taping the edges where her

fence abutted the Harrises' fence.  At approximately 7:30, Dean Harris came out, reached through the gap between the fences, and pulled the tarp down again.  Ms. Holmes saw him, and came outside to re-attach the tarp.  Dean Harris was waiting for her.  He placed a ladder on the Harrises' side of the fence, climbed up, leaned over the fence into Ms. Holmes' property to see what she was doing.  When he saw that she was re-attaching the tarp, he climbed down, reached through the gap between the fences, and began pulling the tarp away from Ms. Holmes, while verbally berating and taunting her, saying "Touch me, I dare you!" or words to that effect, plainly trying to instigate a confrontation.  He then climbed back up the ladder, leaned over into Ms. Holmes' property again, and this time reached down and again began pulling the tarp away from Ms. Holmes:





59.     Detective Harris was in the Harrises' garage, watching these events and waiting for Mr. Harris to find an opportunity to accuse Ms. Holmes of something. Mr. Harris created his opportunity by leaning all the way over the fence, towering over Ms. Holmes and tearing the tarp away from the fence. Ms. Holmes reached over to try to hold the tarp up. As soon as her hand was positioned close to his hand, Mr. Harris turned toward the garage and yelled, "Honey, she stabbed me! Call the police!" He then continued tearing down Ms. Holmes' tarp. Mr. Harris' actions were a setup, and his statement was a deliberate lie. Ms. Holmes never touched Mr. Harris at all. Thankfully, the entire incident was captured on video, and Mr. Harris' lie was exposed.

60.     When Mr. Harris yelled, Arlani Harris immediately went to the gate and began conversing with Mr. Harris. She then went into the house, came back outside and began taking pictures of Mr. Harris's hand (or pretending to do so). Mr. Harris's hand was untouched and unharmed; his claim that Ms. Holmes stabbed him was a deliberate lie, staged together with Arlani Harris and Detective Harris in an attempt to

frame Ms. Holmes for another assault, since they had failed the first time.  Detective Harris exited the garage and promptly called her colleagues at the Altadena Station (just as she had the previous day, April 3, 2018, when multiple on-duty LASD deputies came to the house in response to Detective Harris's complaint that Ms. Holmes' ladder and recycling containers were touching the fence).

61.    Ms. Holmes, fearful of the Harris's intentions, went inside and called 911 herself.  Deputies responded, interviewed both parties, and concluded that there had been no crime committed.  A deputy told Ms. Holmes that Dean Harris had claimed that Ms. Holmes stabbed him, but that the deputies had examined and interviewed Dean Harris and concluded that no crime had occurred.

62.    Ms. Holmes was traumatized and shaken by this incident.  She experiences constant anxiety at the thought that her neighbors can and will attempt to frame her for violent crimes by using Detective Harris's status, connections, and position with the LASD.  Ms. Holmes has complained to the LASD Inspector General's Office and to the commanding officer of the Altadena Station, but so far nothing has been done to stop Detective Harris's abuse of her badge to harass her neighbor.

63.    The fact that the Harrises tried to use Detective Harris's influence to falsely accuse Ms. Holmes *twice* demonstrates that neither incident was an accident, a coincidence, or an honest mistake.  The Harrises deliberately attempted to maliciously and falsely procure the wrongful arrest and conviction of Ms. Holmes on an invented accusation of an attempted violent crime—and they did it *twice*.  Thankfully, they were caught on video both times, and their malicious intent was exposed.

64.    As a result of Defendants' acts, and particularly Detective Harris' use of her position at the LASD to procure the wrongful arrest of Ms. Holmes in February 2017, and her attempt to do the same thing again in April 2018, Ms. Holmes has been driven out of her home.  In February 2017, she moved out of her house for eight months, because she was too afraid to return to her home, out of fear of further

retaliation by Defendants.  Ms. Holmes was forced out of fear to live in hotels for eight months, and was forced to make plans to sell the home she has lived in for nearly 20 years.  The home is simultaneously Ms. Holmes' dream home and her retirement plan.  She moved back in October 2017, but after the April 2018 incident she is now forced to leave again, out of fear of being harassed and framed by the Harrises. She remains in constant fear that Defendants will attempt further retaliation. And selling the house will cause her significant emotional and financial hardship.

65.    Ms. Holmes has suffered and continues to suffer severe emotional and psychological distress arising out of the ordeal.  She has sought counseling to help her deal with the emotional and psychological trauma, which has significantly impacted her personal and professional life activities.

66.    Ms. Holmes will suffer additional damages in the future substantially caused by Defendants' actions. Despite the judgment of factual innocence under Penal Code section 851.8, records of her arrest will still appear in various private database searches and background checks.  Many corporate clients with whom Ms. Holmes contracts conduct background checks of outside consultants, and refuse to hire consultants with any sort of criminal record, including arrests.  It is a substantial certainty that Ms. Holmes will suffer future economic and reputational harms as a result of Defendants' wrongful and malicious false accusation.

## VI.

### CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF

#### (Malicious Prosecution Against All Defendants and Does 1-10)

67.    Ms. Holmes re-alleges and incorporates by reference all preceding and succeeding paragraphs as though fully set forth herein.

68.    Defendants, together and individually, intended to and did cause, and were actively involved in causing, Ms. Holmes to be arrested on suspicion of attempted assault with a deadly weapon.  Defendants, together and individually,

intended and attempted to cause Ms. Holmes to be prosecuted for attempted assault with a deadly weapon.  Defendants acted maliciously and in bad faith, in order to retaliate against Ms. Holmes for seeking a restraining order against Mr. Harris.  Mr. Harris and Arlani Harris contacted LASD deputies and falsely reported to those deputies that Ms. Holmes had attempted to run Arlani Harris over with her vehicle, knowing full well that Ms. Holmes had not done so and that there was no probable cause that Ms. Holmes had committed any crime.

69.    Detective Harris was also actively involved, using her position as a Detective with the LASD to influence and persuade her fellow LASD deputies to arrest Ms. Holmes, knowing full well that Ms. Holmes had not attempted to hit Arlani Harris with her car, and that there was no probable cause that Ms. Holmes had committed any crime.  Detective Harris knowingly promulgated, supported, and furthered Mr. Harris and Arlani Harris's lies and fabrications to the LASD deputies.

70.    The criminal proceeding ended in Ms. Holmes' favor on August 11, 2017, when Judge Darrell Mavis of the Los Angeles County Superior Court made a finding of factual innocence as to Ms. Holmes' actions leading up to her arrest on February 25, 2017.

71.    No reasonable person in Defendants' circumstances would have believed that there were grounds for Ms. Holmes to be arrested.  The video recording of the events evidences that Arlani Harris calmly walked across the street and was never in danger, and that Ms. Holmes' vehicle was driving slowly and safely when it passed behind Arlani Harris; that Arlani Harris never flinched, jumped, scurried, dodged, or otherwise altered her gait; that she laughed as she crossed the street; and that Mr. Harris watched her cross.

72.    Defendants did not accuse Ms. Holmes for the purpose of bringing Ms. Holmes to justice for committing a crime; rather, Defendants accused Ms. Holmes for the purpose of retaliating against her for seeking a restraining order against Mr. Harris in relation to their ongoing dispute, as set forth herein.

73.     Ms. Holmes was harmed by Defendants' wrongful conduct, and Defendants' conduct was a substantial factor in causing her harm.  Ms. Holmes was forced to expend thousands of dollars to make bail after her wrongful arrest, and thousands of dollars in legal fees to obtain a finding of factual innocence related to the events.  Records of the arrest persist in multiple databases and records, and will persist for years to come, causing Ms. Holmes reputational harm and financial harm in the form of likely lost employment opportunities when potential employers view the arrest records.  Ms. Holmes suffered significant financial harm by being forced out of fear to live in hotels for months because she was afraid to return to her home.  Ms. Holmes continues to suffer emotional and psychological harm in the form of constant fear of further retaliatory acts by Defendants that will go unpunished because of Detective Harris' position with the LASD.  Ms. Holmes will suffer economic and emotional harm by being forced out of fear to sell her dream home and investment, causing her financial losses and psychological harms.  Ms. Holmes has also suffered and continues to suffer severe emotional and psychological distress arising from the false and wrongful arrest.

## SECOND CLAIM FOR RELIEF

**(Unreasonable Seizure of Person in Violation of the Fourth Amendment to the Constitution of the United States and 42 U.S.C. § 1983)**

**(Against Detective Harris and Does 1-10)**

74.     Ms. Holmes re-alleges and incorporates by reference all preceding and succeeding paragraphs as though fully set forth herein.

75.     Detective Harris, using her official position, status, and authority as an LASD deputy to influence and persuade her LASD colleagues to arrest Ms. Holmes, acted under color of state law.

76.     By persuading her LASD colleagues to arrest Ms. Holmes based on false and baseless accusations, and knowing that the accusations were based on fabrications, Detective Harris violated Ms. Holmes' Fourth Amendment right to be

1    free from unreasonable seizure of her person.

2        77.    In a show of authority, Detective Harris used her official position, status,

3    and authority to influence and persuade her LASD colleagues to arrest Ms. Holmes,

4    based on the false statements of Mr. Harris and Arlani Harris.  The LASD deputies

5    would not have arrested Ms. Holmes but for Detective Harris's intervention and

6    persuasion.  Following Detective Harris's intervention and persuasion, the LASD

7    deputies wrongfully seized Ms. Holmes, arresting her and holding her in custody.

8        78.    Detective Harris used her official position, status, and authority to

9    influence and persuade LASD colleagues to arrest Ms. Holmes, and in so doing acted

10   intentionally to retaliate against Ms. Holmes for filing a request for a restraining order

11   against Mr. Harris.

12       79.    Detective Harris' request that the LASD deputies arrest Ms. Holmes was

13   unreasonable.  The video recording demonstrates that Mr. Harris and Arlani Harris

14   knew that Ms. Holmes had not committed any crime, and that their story was

15   concocted to punish, harass, and retaliate against Ms. Holmes for requesting a

16   restraining order against Mr. Harris related to the ongoing feud between the parties.[1]

17   Detective Harris knew full well that Ms. Holmes had not committed a crime and that

18   there was no probable cause that Ms. Holmes had committed any crime.

19       80.    It is established as a matter of law and fact, by the Superior Court's

20   ruling on August 11, 2017, that no reasonable cause exists to believe Ms. Holmes

21   committed the offense for which she was arrested.

22       81.    As a direct and proximate result of Detective Harris' actions, Ms. Holmes

23   was wrongfully seized, arrested, and detained.  Ms. Holmes suffered damages as

24   alleged herein.

25   _____

26   [1] Because Defendants' wrongful acts, in joint action and conspiracy with Detective
     Harris and under color of state authority, were carried out in retaliation for Ms.
27   Holmes' exercise of her First Amendment right to access the courts for redress of her
     grievances, they are also violations of 18 U.S.C. § 1983 as retaliation for the exercise
28   of First Amendment rights.

## THIRD CLAIM FOR RELIEF

**(Unreasonable Seizure of Person in Violation of the Fourth Amendment to the Constitution of the United States and 42 U.S.C. § 1983)**

**(Against Mr. Harris and Arlani Harris and Does 1-10)**

82.     Ms. Holmes re-alleges and incorporates by reference all preceding and succeeding paragraphs as though fully set forth herein.

83.     Detective Harris acted jointly with and conspired with Mr. Harris and Arlani Harris to procure the wrongful arrest of Ms. Holmes.  Detective Harris, Mr. Harris, and Arlani Harris were all joint state actors.  Mr. Harris and Arlani Harris, as co-conspirators with Detective Harris in the scheme to wrongfully arrest Ms. Holmes in retaliation for seeking a restraining order against Mr. Harris,[2] acted as joint state actors, co-conspirators, and agents and co-venturers in procuring the false arrest of Ms. Holmes.  As such, they all acted under color of state law, and were joint state actors with Detective Harris.

84.     By joining Detective Harris as co-conspirators and agents and co-venturers, in the conspiracy to use Detective Harris's authority under color of state law to procure the arrest of Ms. Holmes knowing that the allegations were based on fabrications, Mr. Harris and Arlani Harris violated Ms. Holmes' Fourth Amendment right to be free from unreasonable seizure of her person.

85.     In a show of authority, Mr. Harris and Arlani Harris joined with, conspired with, and collaborated with Detective Harris to influence and persuade Detective Harris's LASD colleagues to arrest Ms. Holmes based on their false statements.  Detective Harris' persuasion was successful, and she persuaded the deputies to arrest Ms. Holmes.  The deputies wrongfully seized and arrested Ms.

---

[2] Because Defendants' wrongful acts, in joint action and conspiracy with Detective Harris and under color of state authority, were carried out in retaliation for Ms. Holmes' exercise of her First Amendment right to access the courts for redress of her grievances, they are also violations of 18 U.S.C. § 1983 as retaliation for the exercise of First Amendment rights.

1    Holmes and held her in custody.

2        86.    Mr. Harris and Arlani Harris, acting jointly with Detective Harris, acted

3    intentionally to retaliate against Ms. Holmes for filing a request for a restraining order

4    against Mr. Harris.

5        87.    Mr. Harris and Arlani Harris's, and Detective Harris's, request that the

6    LASD deputies arrest Ms. Holmes was unreasonable.  The video recording

7    demonstrates that Mr. Harris and Arlani Harris knew that Ms. Holmes had not

8    committed any crime, and that their story was concocted to punish, harass, and

9    retaliate against Ms. Holmes for requesting a restraining order against Mr. Harris

10   related to the ongoing feud between the parties.  Mr. Harris and Arlani Harris, and

11   Detective Harris, knew full well that Ms. Holmes had not committed a crime and that

12   there was no probable cause that Ms. Holmes had committed any crime.

13       88.    It is established as a matter of law and fact, by the Superior Court's

14   ruling on August 11, 2017, that no reasonable cause exists to believe Ms. Holmes

15   committed the offense for which she was arrested.

16       89.    As a direct and proximate result of Mr. Harris and Arlani Harris's

17   actions, Ms. Holmes was wrongfully seized, arrested, and detained.  Ms. Holmes

18   suffered damages as alleged herein.

19   //

20   //

21   //

22   //

23   //

24   //

25   //

26   //

27   //

28   //

## VII.

## **PRAYER FOR RELIEF**

Ms. Holmes respectfully prays that this Court grant the following relief:

1. Compensatory, general and special damages against all Defendants in the amount proven at trial.

2. Costs, expenses and reasonable attorneys' fees pursuant to 42 U.S.C. section 1988 and as otherwise authorized by law.

3. Punitive damages against Detective Harris in an amount appropriate to punish her and to deter others from engaging in similar misconduct.

4. Such other relief as the Court may deem proper.

DATED:  May 3, 2018                    Respectfully submitted,

                                                         BROWN WHITE & OSBORN LLP

                                                         By _____
                                                                  CALEB E. MASON
                                                                  SCOTT L. MENGER
                                                                  Attorneys for Plaintiff
                                                                  CRYSTAL HOLMES

## VIII.

## **DEMAND FOR JURY TRIAL**

Ms. Holmes respectfully demands a jury trial.

DATED:  May 3, 2018                    Respectfully submitted,

                                                         BROWN WHITE & OSBORN LLP

                                                         By _____
                                                                  CALEB E. MASON
                                                                  SCOTT L. MENGER
                                                                  Attorneys for Plaintiff
                                                                  CRYSTAL HOLMES

4834-5867-6063, v. 1